(No. 13310.—Judgment affirmed.)

MARY J. KILLEN, Admx. *vs.* H. EDGERTON VANCE, Exr. Defendant in Error.—(CHAUNCEY DEWEY, Plaintiff in Error.)

*Opinion filed October 23, 1920—Rehearing denied Dec. 9, 1920.*

EVIDENCE—*inexperience in business affairs cannot be relied upon to explain away effect of an admission.* Where one of the parties claiming ownership of certain shares of stock involved in an interpleader proceeding has made a statement in a letter to the other party which is inconsistent with his present claim, the fact that he was inexperienced in business affairs and had great confidence in the other party, who was his friend, cannot be relied upon to explain away the effect of the admission.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

HARRY P. WEBER, GEORGE W. MILLER, ARTHUR J. DONOVAN, and ARTHUR A. ANDERSON, for plaintiff in error.

CUTTING, MOORE & SIDLEY, and N. G. MOORE, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This court allowed the petition of plaintiff in error, Chauncey Dewey, for a writ of *certiorari,* and the record is brought here to review the judgment of the Appellate Court reversing a decree of the superior court in favor of plaintiff in error and remanding the cause, with directions to enter a decree in favor of defendant in error, H. Edgerton Vance, executor of the will of J. Nelson Vance. The suit was begun in the superior court by Charles T. Killen filing a bill of interpleader to have determined the ownership of a fund of $2100 of which he was custodian and which was claimed by both plaintiff in error and defendant in error. The fund arose from the sale of part of a

295—7

tract of land belonging to a syndicate in which several persons owned interests, evidenced by what was known as syndicate shares. The money in controversy belonged to the owner of certain seven syndicate shares. Both plaintiff in error and defendant in error claimed ownership of them, and Killen, the custodian, not knowing the merits of their respective claims, filed his bill of interpleader praying a judicial determination of the rights of the contesting claimants. Controverted questions of law have little or nothing to do with the decision of the case. The dispute is purely as to questions of fact, and its determination depends upon which of the two men, Chauncey Dewey and J. Nelson Vance, gave the more credible version of an oral agreement made between them in Wheeling, West Virginia, the last days of December, 1905. Vance was living when the suit was begun and his testimony was taken in form of a deposition. After his testimony was taken before the master to whom the cause was referred Vance died, and his son and executor, H. Edgerton Vance, was substituted as a defendant to the bill. No one else was present when the agreement was made between Vance and Dewey just prior to January 1, 1906, in Wheeling, and what the agreement then made was depends on their testimony. On the real question in dispute their testimony was flatly contradictory. Dewey testified that as a result of the oral agreement between himself and Vance made at Wheeling he became the owner of the seven syndicate shares, which Vance positively denied. Other facts and circumstances, some of them documentary, are relied upon by each of the parties as corroborative of their respective versions of the agreement. The master in chancery of the superior court of Cook county reported recommending a decree in favor of plaintiff in error upon the issue raised by the interpleader, and the chancellor, after overruling objections and exceptions, entered a decree as recommended. Upon appeal to the Appellate

Court the decree was reversed and the cause remanded, with directions to enter a decree in favor of defendant in error.

It appears from the evidence that J. Nelson Vance and Charles P. Dewey, the father of Chauncey Dewey, had for many years been friends and were both interested in some of the same business enterprises. Dewey resided in Chicago and died in 1904. Prior to his death some years he had organized and secured the incorporation of the C. P. Dewey Company and the C. P. Dewey Land and Cattle Company, both Kansas corporations. The Dewey Company had a capital stock of $300,000, one-half of which was common and one-half preferred. The corporation owned ten thousand acres of land in what is known as the sure-crop district in Kansas. At the time of his death Dewey owned all the common stock in that corporation. The capital stock of the Dewey Land and Cattle Company was $300,000, divided into 3000 shares of the value of $100 each, all common stock. It does not appear how much land that corporation owned, but it does appear that it owned considerable land in western Kansas, in what is known as the semi-arid region. Vance acquired 200 shares of the preferred stock of the Dewey Company and 300 shares of the Dewey Land and Cattle Company. He testified he paid par for the stock. Vance became a director in both companies, but they were managed by Dewey until his death. As we understand the testimony, Vance neither before nor after the death of Dewey assumed any of the duties of management of either of the corporations. Charles T. Killen was the secretary and confidential agent of Dewey, and the two were the active parties in the management and control of the corporations until Dewey's death. After Chauncey Dewey finished college, and some time before his father's death, he was sent out to Kansas and spent his time on one or both of the ranches.

In 1889 Charles P. Dewey and J. Nelson Vance purchased a half section of Chicago land and formed an association, not incorporated, called the Vance and Dewey Land

and Investment Company. This association is called a syndicate, and it existed by agreement between the shareholders. The capital of the syndicate was $350,000, divided into 70 shares of the par value of $5000 each. Originally Dewey and Vance owned 25 shares each and the other 20 shares were owned by other persons. The property was managed and sales made by Dewey and Killen until the former's death. Dewey left an estate valued at $2,500,000, with indebtedness of approximately a half million. He left a widow and two children (Chauncey Dewey and a daughter) surviving him. By his will he gave the greater portion of his estate to his son, Chauncey, and Killen, and they were appointed executors of his will. At the time of Dewey's death Vance held his note for $20,000 for borrowed money, which became due April 4, 1905. Vance also held by assignment in blank from Dewey 11 syndicate shares as collateral security for the note. By November, 1905, substantially all of the indebtedness of the Dewey estate had been paid, with the exception of the $20,000 note to Vance. The executors, Chauncey Dewey and Killen, had a talk about offering Vance five of the syndicate shares in payment of the note. November 24, 1905, they jointly wrote Vance at Wheeling, West Virginia, they were paying off the debts of the estate as fast as they could and hoped to settle the estate at an early date. They stated that if agreeable to him they would give him five shares of the Vance and Dewey syndicate of the par value of $25,000 for $20,000. They stated if he accepted the offer they would transfer to him the certificates in payment of the principal of the note and would send a check for the interest due. Vance replied to that letter under date of November 27, 1905, declining to accept the five certificates in payment of the note. November 29, 1905, Chauncey Dewey wrote Vance acknowledging receipt of his letter and said he had talked the matter over with Killen and thought Killen would consent to his offering seven shares of the syndicate for

the note. Among other things he said: "This, as you will see, is figuring each share worth only about $3000. We both feel that this is a sacrifice price, and if you could possibly handle it at all it would greatly benefit my personal interest in this way." Vance did not reply to that letter.

In the latter part of December, 1905, Chauncey Dewey, as was his custom, went to Wheeling to see Vance and spend the holidays. There an oral agreement was made between the parties by which Dewey bought Vance's 500 shares in the two Kansas corporations and agreed to and did give Vance his notes for the aggregate sum of $50,000. He gave three notes, all dated January 1, 1906, one for $15,000 due January 1, 1908, one for $17,000 due January 1, 1909, and one for $18,000 due January 1, 1910, each bearing interest at the rate of five per cent per annum. Vance delivered the stock to Dewey, who had new certificates issued in his own name, indorsed them in blank and sent them to Vance to hold as collateral for the payment of the three notes, aggregating the sum of $50,000. Dewey testified Vance wanted $50,000 for his stock in the two Kansas corporations; that he was not willing to pay that amount for the stock but offered to give Vance his notes for $50,000 for the stock and the seven syndicate shares, which Vance agreed to accept in payment of the $20,000 note of the estate and to deliver to Dewey the stock and the seven syndicate shares when the notes were paid. Vance denied any such agreement was made and denied the syndicate shares were embraced in or had any connection with the $50,000 for which Dewey gave his notes. He testified he sold the stock to Dewey at par, and the notes were given for the stock and nothing else.

The above, in brief, are the statements of the respective parties as to what the transaction was between them and what the $50,000 Chauncey Dewey notes were given for. While the determination of this case depends upon which of the stories testified to by Vance and by Dewey appears

most reasonable and convincing in view of the correspondence between the parties and their acts and conduct, the record is voluminous and the briefs elaborate. We shall only attempt in this opinion to call attention to such parts of the record as seem most important in determining which of the two stories is the better corroborated by other evidence than the oral testimony of the two witnesses.

We have seen that Vance did not reply to the letter of November, 1905, from Chauncey Dewey offering seven syndicate shares in payment of the $20,000 note. January 2, 1906, which must have been immediately after Dewey's return from Wheeling, he wrote Vance: "I have submitted to Mr. Killen a proposition which you accepted concerning the transfer of the seven shares of the Dewey-Vance syndicate company, together with one year's interest, amounting to $1200, in lieu of the cancellation of the note you hold against the estate for $20,000. You will receive a joint letter from him and me concerning this matter within a few days." The letter further told Vance to prepare the three notes, aggregating $50,000, dating them January 1, 1906, send them to Dewey to be signed and returned to Vance and Vance could then send the stock certificates, which Dewey would have re-issued to himself and return them to Vance to hold as collateral for the notes. February 5, 1906, Dewey and Killen wrote Vance they had decided to accept his proposition to take seven syndicate shares in payment of the $20,000 note; that he could cancel the note and send it to the executors, retaining in payment seven certificates of the Vance and Dewey Land and Investment Company, returning to the executors the other four certificates he held as collateral for the note. Vance appears to have sent the canceled note and four of the eleven syndicate certificates he held as collateral by express to the executors, who acknowledged receipt of them under date of February 9, 1906. That correspondence warrants the inference that Vance had proposed at some previous

time to accept the seven syndicate shares in payment of the $20,000, but it throws no light on the question whether Vance sold them to Dewey, as claimed in Dewey's testimony.

Counsel for plaintiff in error argue at length that the stock of the Kansas corporations was not worth par. One of them, the C. P. Dewey Company, had paid a few small dividends prior to 1906, but the other one, the Dewey Land and Cattle Company, had paid no dividends prior to that time. The claim that the value of the stock of the Kansas corporations was much less than par is strongly urged as supporting the claim of Dewey that the notes for $50,000 were not given for the stock alone, but also included the seven syndicate shares. Whether the stock was reasonably worth $50,000 is not the question for decision, but the real question is, Did Dewey agree to purchase the stock at that price and give his notes for that sum? The stock was of substantial value, though its real value was a matter of judgment. Whether its actual value was less than par or not could make no difference in the decision of this case if Dewey agreed to pay that amount for the stock. If he did agree to pay that amount for the stock, then it must be held that he did not buy the seven syndicate shares as a part of the transaction for which he gave his notes. Whatever may have been the previous negotiations and propositions, the seven syndicate shares did not become the property of Vance prior to the date of the letter of Killen and Dewey to Vance of February 5, 1906. March 28, 1908, substantially three months after the $15,000 note Dewey gave Vance became due and more than two years after Dewey bought the stock, Dewey wrote Vance relative to the time when he would pay the note, which had been previously renewed by two notes for $7500 each and the time extended for their payment three and six months. In the letter he referred to the condition of his affairs and said they were in excellent shape; that he owed only a small amount of other indebtedness but it had been difficult for

him to make collections. He said the notes Vance held
were drawing big interest; that they were amply secured
and that there was no mortgage on any of his property,
"and this fact, together with the ones above stated, and the
additional one that I paid you one hundred cents on the
dollar for your C. P. Dewey Company stock when I bought
Mr. Killen's for eighty, and also paid you par for your
land and cattle company stock, which never has and prob-
ably never will pay out as much, should keep you from be-
ing too exacting in the prompt payment of this $15,000
which has become due."

Counsel have endeavored to explain the admission of
Chauncey Dewey that he paid par for the stock of the two
corporations consistently with his testimony that he did not
pay par, but we are not impressed by the explanation. In-
deed, it would seem impossible that any explanation could
be made which would harmonize the direct admission of
Dewey that he paid par for the stock with his testimony
that he did not pay par but that the seven syndicate shares
were a part of the consideration for the $50,000 in notes
he gave Vance. That he was careless and inexperienced in
business affairs, that he was a friend of Vance and had
great confidence in him, cannot explain away the effect of
the letter referred to. No book entry was made by Dewey
at or about the time of the transaction with Vance to in
any way indicate he had bought the syndicate shares. Book
entries made by Vance under date of January 1, 1906,
show the sale to Dewey of the 500 shares of the stock of
the two Kansas corporations for $50,000, for which three
notes were given,—one for $15,000, one for $17,000 and
one for $18,000. Under date of February 5, 1906, book
entries made by Vance show he accepted the seven syndi-
cate shares for the $20,000 note of Charles P. Dewey.
That was the date of the letter from Chauncey Dewey and
Killen saying they had decided to accept Vance's proposi-
tion to take the seven syndicate shares in payment of the

note. On the 31st day of January, 1906, Dewey and Killen, as executors of the C. P. Dewey estate, made a written agreement relative to the administration of the estate, which agreement, among other things, recited that they would endeavor to obtain the consent of the parties interested authorizing the sale of seven syndicate shares of the Dewey estate for at least $20,000 to pay the indebtedness of the estate, and if they failed to get the consent of the parties interested they would apply to the probate court of Cook county for authority to make such sale. This agreement, signed by both Dewey and Killen, recognized the seven shares belonged to the estate of Charles P. Dewey, and though made a month after Dewey testified he had bought the shares and given his notes in payment, no mention of that fact is made in the agreement. Killen testified Dewey never informed him, at any time prior to 1911, that he had bought the seven shares from Vance. Vance kept the Dewey notes for $50,000, the assigned certificates of stock in the corporations and the seven syndicate shares in a blue envelope, marked, "Chauncey Dewey notes and collateral." In January, 1909, Dewey was ready to pay off his notes, and Vance sent his son, Edgerton, who was a man of middle age, to Chicago to settle up the matter with Dewey. Edgerton took the blue envelope with enclosures, which included the seven syndicate shares. When the Dewey notes were paid he delivered the envelope and its contents to Dewey, who thereafter had and held possession of the seven syndicate shares. Dewey claimed they were delivered to him pursuant to the purchase by him from Vance and the agreement by which they were to be delivered to him when his notes were paid. Vance denied this and claimed he overlooked their being in the envelope he delivered to his son when he went to Chicago and that the delivery of the seven shares to Dewey was a mistake and not intended. Vance accepted from Dewey telephone bonds and real estate in payment of the greater portion of the $50,000.

There is no doubt, we think, from the testimony, that the settlement with Dewey was made in Chicago by Edgerton Vance for his father at the time the blue envelope and its contents were delivered to Dewey, but, strange as it may seem, neither of the Vances had any recollection of it. They did not deny that Edgerton Vance came to Chicago and made the settlement with Dewey but neither of them remembered the transaction. Much is made of this circumstance and the bad memory of the Vances as affecting the credit to be given their testimony, and it must be admitted that it is rather remarkable neither of them could recall it. The elder Vance was a banker and engaged in large business enterprises, and his son must have been a man of some business experience, as he had reached the middle years of life.

Another circumstance tending, we think, to strongly support J. Nelson Vance's statement that he never sold the seven syndicate shares to Chauncey Dewey is, that three assessments were levied against all the syndicate shares after Dewey claims he bought the shares from Vance, and all the assessments against the seven shares were paid by Vance and none of them by Dewey. Killen was the active manager of the syndicate. None of the syndicate property had been sold after Dewey claims to have bought the seven shares until 1911. During that time it became necessary for the certificate holders to pay assessments on their shares for the payment of taxes and other expenses of the syndicate. Vance owned 20 of the original shares of the syndicate. He also had the seven shares in dispute, first as part of 11 shares of Charles P. Dewey held as collateral for the $20,000 note, which seven shares he later accepted in payment of that note. He was assessed on 27 shares and paid the assessments on them. The first assessment of $1350 on 27 shares was paid by him in April, 1907; the second one, of $675, was paid in April, 1908; and the third one, of $337.50, was paid in April, 1909. It will be noted the

last assessment was paid by Vance after Dewey had received possession of the seven shares. Notices of these assessments to the shareholders were sent out by Killen. Each of the notices to Vance stated he had 27 shares and the amount of the assessment required from him on that number of shares. At the time these assessments were made the C. P. Dewey estate owned five syndicate shares, and the estate was assessed on the same basis as other shareholders. The estate assessments were paid by checks signed by Dewey and Killen, executors. Dewey was never assessed as a syndicate shareholder and never paid any such assessments, although one of them was made and paid after he had come into possession of the seven shares. Killen testified Dewey had never told him he had bought the seven shares from Vance, and he had no information that Dewey claimed to own them. In the summer of 1911 Killen contracted a sale of a tract of the syndicate real estate to a railroad company for a substantial sum of money. The railroad company would not accept a conveyance from Vance alone, as surviving trustee of the syndicate property, but required the holders of the syndicate shares to exhibit them and that they execute quit-claim deeds. When Vance was notified of this requirement of the purchaser he sent Killen 20 shares. He testified he was unable to find more. His correspondence with Killen does not mention his ownership of other than the 20 shares. Dewey, when informed the railroad company required the production of all the syndicate shares and quit-claim deeds from the persons owning them, produced the seven shares in controversy and claimed to own them. This was the first information Killen had of Dewey's possession or claim of ownership of the shares, and he at once wrote Vance that Dewey had produced the seven certificates, claimed to own them and demanded the dividend on them. Vance replied by wire, telling Killen to hold dividend until he saw him the following Tuesday. He also wrote Killen the seven shares

were his; that he could not understand how Dewey got possession of them and that he was dumfounded at Dewey's attitude. Vance did go to Chicago immediately. Both he and Dewey claimed the syndicate certificates and to be entitled to their *pro rata* share of the dividends from the sale of the property to the railroad company, whereupon the bill was filed by Killen.

We have endeavored to correctly refer to such portions, only, of the testimony in this large record as are in our opinion controlling in arriving at a decision on the merits of the case. After consideration of the testimony and the arguments and theories of the respective parties, which we shall not further set out, we are convinced that there is in the record such corroboration of Vance's version of the transactions between him and Dewey and his claim of ownership of the seven syndicate shares that the Appellate Court did not err in its judgment. Some of Dewey's statements, acts and conduct are much more difficult to harmonize with his claim than are any statements or acts of Vance inconsistent with his claim. In other words, the statements and conduct of Dewey are directly corroborative of Vance's claim and contradictory of his own claim. It is true, there were some acts of Vance from which inferences unfavorable to his claim would be drawn, notably his keeping the seven certificates in the blue envelope with the stock he held as collateral and upon the payment of the notes delivering the envelope with the seven shares and collateral stock to Dewey. But these circumstances were explainable on more reasonable grounds than were the statements and acts of Dewey. Dewey's statements and acts were so inconsistent with his testimony that he bought the seven shares from Vance and that $20,000 of the $50,000 notes he gave Vance represented the price of those shares, that we are unable to point out any valid reason for holding the Appellate Court erred in reversing the decree and remanding the cause with directions. And this is so, independently of whether the

admission in evidence of the book entries made by Vance showing the sale by him to Dewey of the 500 shares of the Kansas corporations for $50,000 was erroneous or not.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*